**SILVERMANACAMPORA LLP**
Counsel to Plaintiff Ronald J. Friedman, Esq.
The Chapter 11 Operating Trustee
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Anthony C. Acampora, Esq.
Brian Powers, Esq.
Haley L. Trust, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:

LEVEL SOLAR INC.,

Chapter 11
Case No. 17-13469 (RG)

Debtor.

------------------------------------------------------------------x
RONALD J. FRIEDMAN, ESQ., as
Chapter 11 Operating Trustee of the Estate of
LEVEL SOLAR INC.,

Plaintiff,

Adv. Pro. No.: 20-_____ (RG)

-against-

WILLIAM FREY, CARRIE FREY,
RICHARD PELL, LISA PELL,
KEVIN JOHNSON, AND QED, LLC,

Defendants.

------------------------------------------------------------------x

## COMPLAINT

Plaintiff Ronald J. Friedman, Esq., the Chapter 11 Operating Trustee (the "**Trustee**" and/or

the "**Plaintiff**") of the estate of Level Solar Inc. (the "**Debtor**"), by his attorneys,

SilvermanAcampora LLP, for his complaint (the "**Complaint**") against defendants William Frey

("**Bill Frey**"), Carrie Frey ("**Carrie Frey**"), Richard Pell ("**Richard Pell**"), Lisa Pell ("**Lisa Pell**"),

Kevin Johnson ("**Johnson**"), and QED, LLC ("**QED**" and, together with Bill Frey, Carrie Frey,

1

Richard Pell, Lisa Pell, and Johnson, the "**Defendants**", and each a "**Defendant**"), alleges as follows:

## THE NATURE OF THIS ACTION

1.      This Complaint seeks damages in excess of $2 million arising of out (a) breaches of fiduciary duties by defendants Bill Frey, Carrie Frey, Richard Pell, Lisa Pell, and Johnson (b) aiding and abetting breaches of fiduciary duties by defendants Bill Frey, Carrie Frey, Richard Pell, Lisa Pell, and Johnson, (c) waste and mismanagement of the Debtor both pre- and post-petition by defendants Bill Frey, Carrie Frey, Richard Pell, Lisa Pell, and Johnson, and (d) promissory estoppel based upon defendants Lisa Pell and QED's breach of promises under the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Chapter 11 Trustee and Pell-QED Proponents*. The Complaint also seeks a judgment disallowing, reducing or recharacterizing the insider claims of equity holder defendants QED, Lisa Pell and Johnson and the equitable subordination of those claims pursuant to section 510(c) of chapter 11, title 11 of the United States Code (the "**Bankruptcy Code**").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b).

3.      This adversary proceeding has been referred to this Court pursuant to §157(a) and the Amended Standing Order of Reference, M-431 dated January 31, 2012, of the United States District Court for the Southern District of New York.

4.      This adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (O).

5.      Venue of this adversary proceeding is proper in this district under 28 U.S.C. §§1408 and 1409.

**THE PARTIES**

6.      The Debtor, a Delaware corporation, was in the solar energy business.  In one aspect of its operations, the Debtor would lease a homeowner's roof and install solar panels.  The Debtor would then fulfill the homeowner's daily energy needs and sell any excess energy to the traditional energy grid.  In exchange, the homeowners received energy at a substantial savings.  The Debtor also earned revenue from the sale of solar energy and retained an interest in the solar panel arrays and in certain tax benefits.

7.      Prior to the December 4, 2017 chapter 11 voluntary bankruptcy filing date (the "**Filing Date**"), the Debtor had offices located in New York and Massachusetts.  The Debtor's New York offices were located in New York City, Queens, Brooklyn, Staten Island, Ronkonkoma, and Hicksville and serviced the New York City area and Long Island.  The Debtor's Massachusetts offices were in Avon, Massachusetts and Westwood, Massachusetts and serviced the Boston area including Southeastern Massachusetts.

8.      On September 28, 2018, the Court entered the *Order Directing the Appointment of Chapter 11 Trustee* (ECF Doc. No. 268).

9.      By Notice of Appointment dated October 5, 2018, plaintiff Ronald J. Friedman, Esq., was appointed as the Chapter 11 Operating Trustee (ECF Doc. No. 281) and is operating in that capacity.

10.      Upon information and belief, at all relevant times, defendant Bill Frey served as a Director on the Debtor's Board of Directors.  In June 2017, Defendants appointed Bill Frey as the president and chief executive officer ("**CEO**") of the Debtor.

3

11.     Upon information and belief, at all relevant times, defendant Carrie Frey was and is the wife of defendant Bill Frey and served as a Director on the Debtor's Board of Directors from 2013 and was appointed as the Debtor's Treasurer in June 2017.

12.     Upon information and belief, at all relevant times, defendant Richard Pell served as a Director on the Debtor's Board of Directors beginning in June 2017 and was appointed the Debtor's Secretary on December 3, 2017.

13.     Upon information and belief, at all relevant times, defendant Lisa Pell was and is the wife of defendant Richard Pell, and is a shareholder of the Debtor, owning a total of 209,536 shares of the Debtor (approximately 10.6% of the Debtor's shares).

14.     Upon information and belief, at all relevant times, defendant QED is a limited liability company with its principal place of business in Connecticut.  QED is also a shareholder of the Debtor, owning a total of 824,085 shares of the Debtor (approximately 42% of the Debtor's shares).

15.     Upon information and belief, at all relevant times, QED's members were and are defendants Bill Frey and Carrie Frey.

16.     Upon information and belief, at all relevant times, defendant Johnson was an investor in the Debtor and became its interim CEO in 2017.

17.     Upon information and belief, Defendants agreed to pay defendant Johnson $80,000 per month which was evidenced by convertible notes.  Defendant Johnson worked as interim CEO for four months.

**ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

18.     The Debtor was engaged in the business of (a) solar sales and installation, (b) the sale of excess solar energy to the traditional energy grid, and (c) solar finance which included the retention of a residual interest in solar panel arrays and in certain tax benefits.

19.     Upon information and belief, Richard Keiser ("**Keiser**") was the founder of and a common shareholder in the Debtor and, prior to June 2017, the Debtor's CEO.

20.     Upon information and belief, defendants Bill Frey and Carrie Frey, through defendant QED, and defendant Lisa Pell as well as their associate, defendant Johnson, were investors in the Debtor.

21.     Upon information and belief, defendants Bill Frey and Richard Pell played lead roles in soliciting new investors for the Debtor, and also helped set the Debtor's valuation for investment purposes.

**QED's Investments in the Debtor**

22.     Upon information and belief, in November 2013, QED made its first investment in the Debtor and became a preferred shareholder.

23.     Upon information and belief, at the time of QED's first investment, QED, Keiser, and the Debtor entered into an "Investor Rights Agreement" (the "**Investor Rights Agreement**") that delineated certain rights and duties of the shareholders.  Under the Investor Rights Agreement, Keiser was the "common director" and defendant Carrie Frey was the "preferred director."

24.     In litigation pending in the United States District Court for the Southern District of New York entitled  "QED, LLC, and Ronald J. Friedman, solely in his capacity as Chapter 11 Trustee of Debtor Level Solar, Inc. v. Faber Daeufer & Itrato, P.C., Kenneth Itrato, and David Nicolaisen" bearing Civil Action No. 1:20-cv-02767 (VEC), defendant QED alleged the existence

of certain irregularities under the Investor Rights Agreement that caused substantial damage to QED and the other Defendants as well as to the Debtor.

**The Debtor's Need for Additional Capital**

25.     Upon information and belief, in 2017, the Debtor was seeking additional capital which certain Defendants, as investors, declined to provide to it.

26.     Upon information and belief, in the spring of 2017, the Debtor's representatives were negotiating an investment/merger transaction (the "**Transaction**") with a Publicly Traded Energy Company (the "**PTEC**") under which (a) the PTEC would have made an investment in the Debtor, and (b) the Debtor would have received the benefit of the cross-marketing of its solar energy services to hundreds of thousands of the PTEC's customers.

27.     Upon information and belief, the Transaction would have resulted in the dilution of the equity interests of the then-current shareholders, including Defendants, who declined to accept any such dilution of their equity interests.

28.     Upon information and belief, on June 14, 2017, during the PTEC negotiations, the investor Defendants removed Keiser as an officer and director and eventually terminated him as an employee of the Debtor.

29.     Upon information and belief, Defendants did not pursue further or otherwise investigate the wisdom of the PTEC Transaction.  Nor did the investor Defendants provide the Debtor with any additional capital.

30.     After June 14, 2017, Defendants took exclusive control of the Debtor's business and operations.

31.     Upon information and belief, Defendants appointed defendant Bill Frey as President and CEO.

32.     Upon information and belief, neither defendant Bill Frey, defendant Johnson, nor any of the other Defendants had any experience operating a business in the energy field, the solar energy field, or in residential construction.

33.     Upon information and belief, under Defendants' management, key performance metrics of the Debtor's business rapidly declined and key employees, including the Vice President of Sales, the Vice President of Finance, and top performers on the sales team, resigned.

34.     Upon information and belief, during the period in which they operated the Debtor and even during the post-petition period before they were removed and the Trustee was installed, Defendants took virtually no action to safeguard the Debtor's most critical assets, including but not limited to, its confidential information and intellectual property.

35.     Upon information and belief, under Defendants' not-so-watchful eye, solar installation contracts were stolen by competitors who hired the Debtor's disgruntled former employees and salespeople.

36.     Upon information and belief, during the period in which they operated the Debtor, Defendants allowed critical sales and other confidential information pertaining to the Debtor's business and operations to be taken by former employees and provided to the Debtor's competitors who, upon information and belief, use the Debtor's information for their own benefit and to the detriment of the Debtor.

37.     Although Defendants were well aware of the diversion of the Debtor's business opportunities, confidential information, and intellectual property, Defendants took absolutely no action, other than to send "cease and desist letters," to either recover any of those vital assets or to implement further safeguards to prevent future losses.

38.    At the Bankruptcy Code §341 meeting in the Debtor's case, defendants Bill Frey and Richard Pell outlined extensive litigation that they believed that the Debtor possessed against a litany of third parties.

39.    Indeed, much of the Bankruptcy Code §341 meeting testimony by defendants Bill Frey and Richard Pell centered around the litigation claims that each believed the Debtor possessed against various parties.

40.    Despite those assertions, in the fifteen (15) months between the time Defendants took control of the Debtor and the appointment of the Trustee, Defendants did not commence a single action in furtherance of any of that allegedly valuable litigation.

41.    Indeed, despite their allegations of fraud and mismanagement by the Debtor's former management team, Defendants did not hire any forensic accountant or other restructuring professional.

42.    Rather, Defendants retained the services of Peg Finkle ("**Finkle**"), a part-time bookkeeper affiliated with defendant Johnson.

43.    Upon information and belief, the retention of Finkle, an individual who was not a CPA and worked only part-time, did not benefit the Debtor either during Defendants' pre-petition or post-petition control of the Debtor's business and operations.

44.    Rather, upon information and belief, Defendants' retention of Finkle was intended to assist Defendants in salving their investments in the Debtor rather than rehabilitating the Debtor's allegedly failing operations and paying its legitimate, non-insider creditors.

45.    Moreover, after the appointment of the Trustee, Finkle, who was wholly unfamiliar with the Debtor's business and operations but whom Defendants had entrusted with all of the Debtor's information, could not (or in some cases, would not without defendant Bill Frey's prior

"approval") provide the Trustee and his retained professionals with the documents and information necessary to bring the Debtor's chapter 11 case to an expeditious conclusion.

46.     Eventually, Defendants retained the services of the Kansas accounting firm, Meara Welch Browne ("**MWB**").

47.     Further, at the Bankruptcy Code §341 meeting, defendant Bill Frey explained that, ostensibly based upon Defendants' knowledge of the Debtor's business and operations, the Debtor was entitled to payments after the payment of New York Green Bank of upwards of $32 million on a present value basis.

48.     That statement has proved to be patently incorrect and uninformed.

**Lapse in The Debtor's Workers' Compensation Insurance Policies**

49.     Upon information and belief, based at least in part upon Defendants' unwillingness to invest capital into the Debtor or to explore outside financing, the financial obligations of the business continued to grow causing the Debtor to stop making payments to critical vendors, including the New York State Insurance Fund ("**NYSIF**").

50.     Upon information and belief, prior to the suspension of Debtor's workers compensation insurance policies, the Debtor had arranged a payment plan with NYSIF to ensure that the Debtor met its workers' compensation obligations.

51.     Upon information and belief, thereafter defendants Bill Frey and Johnson directed that the Debtor pay personal legal fees associated with the termination of Keiser, thereby leaving the Debtor with insufficient funds to pay its obligations under the workers' compensation insurance policies.

52.     Upon information and belief, the Debtor eventually paid $171,000 to NYSIF to avoid cancellation of the Debtor's workers' compensation insurance policy.  However, NYSIF

indicated that the Debtor was also required to pay an additional $739,066.41 for the Debtor's policy periods of 2014-2015 and 2015-2016. NYSIF demanded that this payment be made by September 19, 2017.

53.     Upon information and belief, the Debtor, while under Defendants' control, failed to make any of the required payments to NYSIF on or before September 19, 2017.

54.     Upon information and belief, as a result of that payment default, NYSIF required a large lump sum payment for the outstanding balance, and a prepayment for 2018 insurance coverage.

55.     Upon information and belief, unwilling to make the payment, Defendants terminated all of the Debtor's employees without notice and shuttered the Debtor's operations on September 19, 2017.

56.     Upon information and belief, such termination extinguished any non-competition agreements that the Debtor had with its employees.

57.     Further, upon information and belief, at a meeting held on September 19, 2017, Defendants advised the Debtor's employees that they had been released from any non-compete obligations they may have had with the Debtor.

58.     Upon information and belief, as a result of the Debtor's failure to pay the required premiums for the Debtor's worker compensation policy in Massachusetts, the Debtor's policy was terminated in July 2017.

59.     Upon information and belief, defendants Bill Frey and Johnson nonetheless continued to operate the Debtor in Massachusetts without having a workers' compensation policy in place.

60.     Upon information and belief, on September 1, 2017, one of the Debtor's employees fell off of a roof while working and was seriously injured as a result.

61.     Upon information and belief, on September 5, 2017, defendant Johnson directed all employees working in Massachusetts to cease all installation projects, thereby halting all revenue from the Debtor's operations in Massachusetts.

62.     On September 21, 2017, two (2) former employees of the Debtor commenced a class action in the New York State Supreme Court against the Debtor on behalf of themselves and similarly situate former employees of the Debtor (the "**Class**") seeking damages allegedly incurred under the WARN Act (the "**Class Action**").

63.     The Class Action was stayed by the filing of the Debtor's chapter 11 case and was transferred to the Bankruptcy Court.

64.     On June 26, 2019, the Bankruptcy Court entered a final order pursuant to Rule 23 of the Federal Rules of Civil Procedure and Rule 9019 of the Federal Rules of Bankruptcy Procedure approving the Class Action settlement and providing the Class with an Allowed Class 1 Claim for $400,000 and class counsel's request for fees and costs (Case No. 18-01012 (MKV) (ECF Doc. No. 32).

### The Debtor's Funds and Its Removal As Managing Member

65.     As part of the Debtor's solar finance business, the Debtor financed the purchase of solar panel arrays through two primary lenders using tranche funding structured to cover the purchase, installation, and permit process relating to the solar array equipment.

66.     The agreements with the Debtor's lenders were done through separate entities owned by the Debtor, two (2) of which served to address the rights and responsibilities between the Debtor and the New York Green Bank, a division of the New York State Energy Research &

Development Authority.  Those Delaware limited liability companies were (a) Level Solar Master Holdings I LLC ("**Fund I**"), and (b) Level Solar Master Holdings II LLC ("**Fund II**" and, together with Fund I, the "**Green Bank Funds**").

67.     Two other entities addressed the rights and responsibilities of the Debtor and Firstar Development LLC, a Delaware limited liability company.  Those Delaware limited liability companies were (a) Level Solar Fund III LLC ("**Fund III**"), and (b) Level Solar Fund IV LLC ("**Fund IV**" and, together with Fund III, the "**Firstar Funds**").

68.     The Debtor was the managing member (the "**Managing Member**") of each of those four funds; either directly in the case of the Green Bank Funds or through affiliates (Level Solar Holdings III LLC, and Level Solar Holdings IV LLC) in the case of the Firstar Funds.

69.     Upon information and belief, control of those financing vehicles as the Managing Member was valuable to the Debtor because it enabled the Debtor to set the terms of its offering to consumers, thereby giving it a competitive advantage in the market, and it enabled the Debtor to participate in, and to retain the value of, the financing vehicles, which can grow to hundreds of millions of dollars.

70.     Upon information and belief, the funds that had been controlled by the Debtor totaled over $100 million in solar assets (on a fair market value basis).

71.     The Debtor, as Managing Member, was also specifically responsible for the distribution of cash owed to Firstar and New York Green Bank.

72.     To facilitate accounting, separate bank accounts are generally established for these financing vehicles.  In the case of the Debtor, the bank account dedicated to the financing vehicles ended in the digits x4289, while Debtor's operating account ended in the digits x4270.

73.     Upon information and belief, while under Defendants' control, between September 19, 2017 and November 30, 2017, the Debtor transferred a substantial sum of money from the x4289 account, owed to its banking partners, to its own operating account, x4270.

74.     Those banking partners claim that those transfers violated the Debtor's contractual obligations to its banking partners.

75.     On Friday, December 1, 2017, the New York Green Bank sent to the Debtor a Notice of Default Under Amended And Restated Loan Agreement And Removal As Manager.

76.     As a result of this action and similar actions by Firstar, the Debtor lost the ability to continue to transact with the very financing vehicles it created, collectively Funds I, II, III, and IV, and to manage their assets, both valuable and coveted positions.

77.     Fund IV was established in December, 2016 with a financing capacity exceeding $50 million and, upon information and belief, on December 1, 2017, had between $25 million to $30 million in transaction capacity at the time of the Debtor's removal as Managing Member.

78.     Upon information and belief, the capacity in Fund IV was a significant asset which the Debtor could have used to re-establish a financing business for third parties, and to generate millions of dollars of cash flows for the Debtor.

79.     Upon information and belief, due to Defendants' management failures and breaches of fiduciary duty that opportunity and cash were lost when the Debtor was removed as Managing Member of the Funds.

**The Debtor's Failure To Make Progress Toward**
**Reorganization and Mismanagement of the Debtor**

80.     After the Filing Date and in the intervening nine (9) months until the appointment of the Trustee, Defendants, on behalf of the Debtor, failed to prosecute its chapter 11 case in an expeditious manner.  That failure lead to the appointment of the Trustee.

81.     During their tenure in control of the Debtor and during the Debtor's chapter 11, defendants Bill Frey and Richard Pell made numerous representations to the Court including, (a) their intention to bring to current the financial records of the Debtor; (b) their intention to engage a qualified accountant; and (c) their intention to correct and file accurate monthly operating reports ("**MORs**").

82.     Upon information and belief, despite being in control of the Debtor from June 2017, Defendants and their representatives claimed they did not have financial records, and then admitted under oath that they did receive financial information, and that the Debtor had always received clean audits.

83.     On April 12, 2018, the Court held a hearing on the First Motion to Convert.  At the hearing, in opposition to the First Motion to Convert, the Debtor's representatives represented to the Court that it would file a "100% plan" of reorganization in "two to three weeks" from the hearing date.  They also stated that the MORs were "fixed."

84.     On May 22, 2018, the Office of the United States Trustee filed a letter requesting a status conference as a result of the Debtor's failure to file a plan of reorganization and to "cure errors in its then filed operating reports." [*see* Docket No. 173]

85.     As a result, the Court set a status conference for May 31, 2018.

86.     At the May 31, 2018 status conference, the Court stated "[y]ou committed to or you represented that you were planning to file a proposed plan and disclosure statement within a couple

of weeks. None of that have happened." Nonetheless, no updated timeline was presented by the Debtor for the filing of a plan that was purportedly ready to be filed in April of 2018. Additionally, although the Debtor stated that its MORs had been corrected, they had not.

87.     During the chapter 11, the Debtor's representatives made numerous representations to the Court including, *inter alia*: (a) their intention to bring to current the financial records of the Debtor; (b) their intention to file a plan of reorganization within two to three weeks of April 12, 2018 Hearing; (c) their intention to engage a qualified accountant; and (d) their intention to correct and file accurate MORs.

88.     Upon information and belief, contrary to the blanket misrepresentations made by the Debtor's representatives, the MORs submitted to the Court were replete with errors which were raised by the United States Trustee.

89.     During Defendants' control of the Debtor during the chapter 11 and prior to the appointment of the Trustee, the Debtor alleged that (a) "the MORs are current and do not contain errors," and (b) "there has been no substantial or continuing loss to the estate."

90.     However, as set forth in the May 2018 MOR, the Debtor incurred a net loss of over $280,000 through May 31, 2018.

91.     According to the June 2018 MOR, the Debtor incurred a net loss of $328,000 since the Filing Date, representing over 55% of its total cash assets, and lost another $45,000 in June 2018.

92.     Moreover, between the Filing Date and the Debtor's June 2018 MOR, the Debtor's former banking partners, Firstar and New York Green Bank, filed objections stating that the Debtor's cash assets are not its own and that it was very likely that all of the Debtor's cash was owed to other parties and that the Debtor's net cash was negative.

93.     Further, in the Debtor's June 2018 MOR, the Debtor described the Debtor's two largest assets, Accounts Receivable of $32.1 million, and Other Current Assets of $15.9 million, as "unverified" and "prepetition," respectively, and, therefore, not current, and not accurate.

94.     Despite the numerous concerns voiced by the United States Trustee and the Court, at the status conference held on July 10, 2018, the Debtor's representatives conveyed that they were continuing to rely on their part-time bookkeeper, Finkle, to keep the books of the Debtor and prepare the Debtor's MORs, even when the MORs contained material errors.

95.     As a direct result, neither the Court nor the Debtor's creditors had the ability to determine the Debtor's true financial state or its ability to continue operating in chapter 11.

96.     Prior to the appointment of the Trustee, certain Defendants claimed under oath, that they did not have bank statements for the Debtor and to not know how to access the Debtor's on-line bank accounts.

97.     At a hearing held on August 22, 2018, the following colloquy ensued between the Debtor's counsel and the Court:

> MR. CONWAY: I do, Your Honor. And frankly, we have - I shouldn't say "we".  But the stockholders have plans for what they're going to do with this company going forward to recover all those net operating losses and thereby make it a viable business. They have opportunities that are being handed to them as we speak. There's no basis to talk about them. It's not –
>
> THE COURT: But your statement goes to the heart of why we're here. You say the stockholders have plans, and yet it's not all the stockholders. ***It's certain stockholders. And they are not supposed to be the ones who are the driving force here. This is all supposed to be being done for the benefit of the creditors.***

Hr'g Tr. 50:14-51:1 (Aug. 22, 2018) [Docket No. 238] (emphasis added).

**The QED, Lisa Pell and Johnson Proofs of Claim**

98.     On June 11, 2018, QED filed a proof of claim in the Debtor's case in the amount of $6,046,000.85 for a loan QED purportedly provided to the Debtor.

99.     On June 11, 2018, Lisa Pell filed a proof of claim in the Debtor's case in the amount of $6,507,533.05.

100.    On June 11, 2018, Kevin Johnson filed a proof of claim in the Debtor's case in the amount of $843,761.04.

**FIRST CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**
**Breach of Fiduciary Duties**
**Under Delaware General Corporation Law**
**(incorporating all prior allegations)**

101.    Under Delaware General Corporation Law, Defendants, as officers, directors, and shareholders of the Debtor owed the Debtor the basic fiduciary duties of care and loyalty, including good faith, oversight, and disclosure.

102.    Defendants breached each of the foregoing duties causing serious damage to the Debtor.

103.    Defendants, as officers and directors of the Debtor, were required to be independent and disinterested and were required to maintain the Debtor's books and records.

104.    Upon information and belief, Defendants breached their duty of independence and utterly failed to maintain appropriate books and records for the Debtor.

105.    Defendants, as directors of the Debtor, were required to exercise informed business judgment when acting on behalf of the Debtor and were required to be properly informed about critical of actions to be taken on behalf of the Debtor.  Defendants were required to be informed and deliberative in their decision-making based on all material information reasonably available.

106.    When acting on behalf of the Debtor, Defendants were required to examine the premises of any proposed action or inaction, including the benefits and risks, and to understand and to weigh the alternatives.

107.    Upon information and belief, Defendants failed to exercise informed business judgment when acting on the Debtor's behalf.

108.    When acting on behalf of the Debtor, Defendants were required to act in good faith in the best interests of the Debtor, its creditors, and its stockholders collectively.

109.    Upon information and belief, Defendants failed to act in good faith.

110.    The oversight aspect of Defendants' duty of loyalty includes board-level attention to the Debtor's risk management with particular attention focused on oversight of compliance with law and related protocols in highly regulated mission-critical aspects of the Debtor's business.

111.    Upon information and belief, Defendants breached this duty by (a) consciously failing to implement a board-level system to monitor reasonably the Debtor's compliance with applicable law and related protocols, or (b) consciously ignoring red flags signaling material noncompliance with such law and protocols.

112.    Defendants acted with conscious disregard of their duties to the Debtor and to its creditors.

113.    Defendants neglected and failed to perform their duties as officers in the management and disposition of the Debtor's assets committed to their charge and thereby wasted and mismanaged such corporate assets.

114.    Defendants breached their fiduciary duties to the Debtors by failing to discharge their duties as officers and directors of the Debtor with the degree of care, skill, prudence, and

diligence required of them, and their conduct constituted an extreme departure from the ordinary standard of care.

115.    By reason of the foregoing, the Debtor was unable to repay its indebtedness to its legitimate creditors  and was required to cease operations and liquidate all assets.

116.    By reason of the foregoing, the Debtor was damaged in an amount as yet undetermined, but in no event less than $2,000,000, together with pre-judgment and post-judgment interest thereon.

117.    By reason of the foregoing, Defendants are liable to Plaintiff to account for their conduct and to pay damages in an amount as yet undetermined, but in no event less than $2,000,000 together with pre-judgment and post-judgment interest thereon.

### SECOND CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS
### Aiding & Abetting Breach of Fiduciary Duties
### (incorporating all previous allegations

118.    Defendants each breached their fiduciary duties of care and loyalty that they each owed to the Debtor and to the Debtors' creditors.

119.    Defendants, in their roles of shareholders, officers, and directors, knew that each of the other Defendants were breaching their fiduciary duties of care and loyalty and gave substantial assistance or encouragement to them in these bad acts.

120.    Through this conduct, each Defendant aided and abetted the other Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors' interests in an amount to be determined at trial but in no event less than $2 million.

**THIRD CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**
**Waste and Mismanagement Under**
**Delaware Business Corporation Law**
**(incorporating all previous allegations)**

121.    Defendants, as officers and directors of the Debtor, caused the Debtor to squander

its assets, leaving it unable to pay its debts or continue operating as a going concern.

122.    By reason of the foregoing, the Defendants unlawfully wasted and mismanaged the

Debtor's assets.

123.    By reason of Defendants' malfeasance, the Debtor was harmed in an amount to be

proven at trial, but in no event less than $2,000,000, together with interest thereon and attorneys'

fees.

124.    The Defendants are liable to Plaintiff for the losses they caused, in an amount to be

proven at trial, but in no event less than $2,000,000, together with interest thereon and attorneys'

fees.

**FOURTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**
**Pursuant to 11 U.S.C. § 510(c)**
**(incorporating all previous allegations)**

125.    The conduct of Defendants, all of whom are insiders who exercised control over

the Debtor, are subject to closer scrutiny than those who dealt at arm's length with the Debtor.

126.    At all relevant times, Defendants exercised total control over the Debtor's voting

stock.

127.    At all relevant times, Defendants exercised managerial control over the Debtor,

including decisions as to which creditors of the Debtors would be paid.

128.    Upon information and belief, Defendants engaged in wrongful acts of self-

dealing and other breaches of fiduciary duty in connection with their control over the Debtor's

financial affairs for the purpose of protecting their respective interests at the expense of the rights of the Debtor's creditors.

129.     Defendants' unlawful conduct directly and proximately caused harm to the Debtor and to the Debtor's creditors.

130.     The subordination of Defendants' claims is consistent with the provisions of the Bankruptcy Code.

131.     By reason of the foregoing, Plaintiff is entitled to judgment subordinating any claim asserted by or scheduled in favor of Defendants to the rights, claims and interests of all other claimants in the Debtor's chapter 11 case.

**FIFTH CLAIM FOR RELIEF
AGAINST LISA PELL AND QED
Promissory Estoppel
(incorporating all previous allegations)**

132.     After the appointment of the Trustee, the Trustee endeavored to propose a chapter 11 plan that was confirmable and would have the support of the Debtor's creditor constituencies.

133.     In his discussions with defendants Lisa Pell and QED (together, the "**Plan Proponent Defendants**"), through their counsel, the Trustee was informed that the Plan Proponent Defendants wished to, among other things: (i) settle any and all of the Debtor's claims against them, including those brought in this adversary proceeding, and (ii) acquire all of the equity in the Debtor through a chapter 11 plan.

134.     Accordingly, the Trustee and his counsel engaged in extensive negotiations with the Plan Proponent Defendants regarding the terms of a chapter 11 plan of reorganization for the Debtor, and an initial draft of a proposed plan was prepared by counsel to the Plan Proponent Defendants.

21

135.    On October 4, 2019, the Trustee filed the *Joint Chapter 11 Plan of Reorganization of Chapter 11 Trustee and Pell-Qed Proponents* (ECF Doc. No. 357) (the "**Joint Plan**"), which was executed by counsel to the Plan Proponent Defendants.

136.    Among other things, the Joint Plan provided that the Plan Proponent Defendants agreed to provide the Debtor's estate with the "Pell-QED Contribution" and the "Pell-QED Advance" (together, the "**Plan Funding**") as those terms were defined in the Joint Plan.  Based upon his analysis of the Debtor's financial affairs and the claims filed in the Debtor's case, the Trustee believed that the Plan Funding would be sufficient to make all payments necessary to confirm the Joint Plan and to provide sufficient funding for a post-confirmation creditor trust to prosecute causes of action for the benefit of creditors as contemplated in the Joint Plan.

137.    In order to ensure that the Plan Proponent Defendants provided the Plan Funding as promised, the Trustee required that the Plan Proponent Defendants provide the Trustee with a deposit in the amount of $500,000 to be applied against the amount of the Plan Funding (the "**Funding Deposit**"), which the Trustee believed would be sufficient to adequately compensate the estate for administrative costs incurred if the Plan Proponent Defendants failed to provide the Plan Funding.  The Trustee received the Funding Deposit and it is currently being held in the estate "earnest money" account.

138.    Because the Trustee believed that the Joint Plan was confirmable and in the best interests of the Debtor's estate, due in large part to the Plan Proponent Defendants' promise to provide the Plan Funding, the Trustee and his counsel expended considerable time and resources after the filing of the Joint Plan negotiating with the Debtor's major creditor constituencies to resolve any objections to the Joint Plan.

139.    On December 12, 2019, the Trustee, through counsel, prepared and filed the *First Amended Joint Chapter 11 Plan of Reorganization of Chapter 11 Trustee and Pell-QED Proponents* (ECF Doc. No. 369) (the "**First Amended Joint Plan**") and its related disclosure statement (ECF Doc. No. 370), as well as a motion to approve the disclosure statement for the First Amended Joint Plan.

140.    Over the course of the following several months, in reliance upon the Plan Proponent Defendants' promise to provide the Plan Funding, the Trustee engaged in substantial litigation and discovery with counsel to the Firstar Funds with respect to the confirmation of the Second Joint Plan, as well as continued negotiations with the Debtor's various creditor constituencies.   As a result of the foregoing, the Trustee and his counsel filed several more iterations of a joint plan of reorganization for the Debtors (ECF Doc. Nos. 395, 411, and 422)[1] and related disclosure statements (ECF Doc. No. 396, 412, and 423).   Each of the foregoing documents was executed by counsel to the Plan Proponent Defendants, and each explicitly stated that the Plan Proponent Defendants had agreed to provide the Plan Funding.

141.    In reliance upon the Plan Proponent Defendants' continued promise to provide the Plan Funding under the Fourth Amended Joint Plan, the Trustee and his professionals solicited acceptances of the Fourth Amended Joint Plan and extensively prepared for a contested hearing to confirm the Fourth Amended Joint Plan scheduled for June 30, 2020.

142.    The ballots cast to accept the Fourth Amended Joint Plan reflected that the Fourth Amended Joint Plan was accepted by all classes of creditors, and the Trustee expected that the Court would confirm the Fourth Amended Joint Plan.

---

[1] The amended joint chapter 11 plan filed at ECF Doc. No. 422 is referred to herein as the "**Fourth Amended Joint Plan**."

143.    On June 25, 2020, the counsel to the Plan Proponent Defendants informed the Trustee that they no longer wished to proceed with the Fourth Amended Joint Plan and that they would not be providing the Plan Funding.  As a result, the Trustee was forced to withdraw the Fourth Amended Joint Plan.

144.    Pursuant to every iteration of the Joint Plan, including the Fourth Amended Joint Plan, the Plan Proponent Defendants promised the Trustee and the Debtor's estate that they would provide the Plan Funding.

145.    The Trustee relied upon the promise of the Plan Proponent Defendants to provide the Plan Funding to the detriment of the Trustee and the Debtor's estate.

146.    As a result of the foregoing, the Trustee and the Debtor's estate suffered damages in an amount as yet undetermined but in no event less than $500,000.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff as follows:

a.    On the First Claim for Relief, entry of judgment against Defendants in an amount to be determined at trial, but in no event less than $2,000,000, together with interest thereon;

b.    On the Second Claim for Relief, entry of judgment against Defendants in an amount to be determined at trial, but in no event less than $2,000,000, together with interest thereon;

c.    On the Third Claim for Relief, entry of judgment against Defendants in an amount to be determined at trial, but in no event less than $2,000,000, together with interest thereon;

d.    On the Fourth Claim for Relief, entry of judgment subordinating any claim asserted by or scheduled in favor of Defendants to the rights, claims and interests of all other claimants in the Debtor's chapter 11 case;

e.    On the Fifth Claim for Relief, entry of judgment against the Plan Proponent Defendants in an amount to be determined at trial, but in no event less than $500,000, together with interest thereon;

    f.      Awarding Plaintiff attorneys' fees, costs, and other expenses incurred in this adversary proceeding; and

    g.      Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:  Jericho, New York
         August 6, 2020

                                **SILVERMANACAMPORA LLP**
                                Attorneys for Plaintiff Ronald J. Friedman, Esq., the Chapter 11 Operating Trustee

                 By:     *s/ Anthony C. Acampora*
                             Anthony C. Acampora
                             A Member of the Firm
                             100 Jericho Quadrangle, Suite 300
                             Jericho, New York  11753
                             (516) 479-6300